Filed 8/31/22  P. v. Winchester CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>NOAH WHITE WINCHESTER,<br><br>          Defendant and Appellant. | A159539<br><br>(San Mateo County<br>Super. Ct. No. 16-<br>SF-008803-A) |

Defendant Noah White Winchester appeals from numerous convictions arising out sexual assaults of four women while he was an on-duty police officer.  He asserts the trial court erred in allowing certain witnesses to testify with a support dog.  He also claims the prosecutor committed numerous instances of misconduct in closing argument.

In supplemental briefing, defendant maintains the matter should be remanded for resentencing based on the amendment to Penal Code section 654[1] effective January 1, 2022, which gives courts discretion to stay either of the counts based on the same act.  The Attorney General agrees the amendments to section 654 apply retroactively and that the matter should be remanded so the trial court can decide whether to stay the sentence on the

---

[1] All further statutory references are to the Penal Code.

burglary to commit rape conviction (count 4) or the attempted rape conviction (count 5) as to a single victim. As to the remaining counts for which defendant seeks remand, the Attorney General maintains remand is unnecessary because the court had no discretion to stay execution of sentences imposed under the One Strike law.

We remand to the trial court for resentencing as to counts 4 and 5 to allow the court to exercise its discretion as to which count to stay, and we direct the court to stay execution of sentence on count 15. In all other respects, we affirm the judgment.

## BACKGROUND

We set forth only those facts necessary to address the issues on appeal. Defendant, a former police officer in San Mateo and Sacramento, was charged by information with crimes against four victims, committed while he was on-duty.[2] As to S.C., defendant was charged with two counts of rape by threat of arrest (counts 2 & 3), and one count of kidnapping to commit rape (count 1). (§§ 209, subd. (b)(1), 261(a)(7).) As to A.A., he was charged with residential burglary and attempted rape by threat to arrest (counts 4 & 5). (§§ 460, subd. (a), 664, 261, subd. (a)(7).) As to Danielle M., he was charged with two counts of sexual battery by restraint (counts 6 & 7). (§ 243, subd. (a).) As to Destiny M., he was charged with kidnapping to commit rape (count 15) (§ 209, subd. (b)(1)), forceful oral copulation (count 17) (§ 288a, subd. (c)(2)(A)), oral copulation by threat to arrest (count 18), (§ 288a, subd. (k)), rape (§ 261, subd. (a)(2)) (count 19), rape by threat to arrest (count 20) (§ 261, subd. (a)(7)), forceable oral copulation (count 21) (§ 288a, subd. (c)(2)(A)), and oral copulation by threat of arrest (count 22). (§ 288a, subd. (k).)

---

[2] The court dismissed eight counts and certain enhancements before jury deliberations. We set forth only the remaining counts.

2

Prior to trial, the prosecutor filed a motion to allow the complaining witnesses to testify with a support dog. At the hearing, defendant objected that the dog's presence would violate his confrontation rights and be prejudicial. He specifically objected to the witnesses being allowed to pet the dog. The court granted the motion allowing the support dog and did not forbid the witnesses to pet the dog.

A jury found defendant guilty of all remaining charges and found all the enhancing allegations to be true.[3] The trial court sentenced defendant to a total term of 81 years to life.

## DISCUSSION

### *Presence of Support Dog*

Defendant maintains the court abused its discretion in allowing the prosecution witnesses to testify with a support dog, claiming the dog's presence violated his right to due process and confrontation and "was likely to have unfairly biased jurors in favor of the prosecution."

The Legislature has authorized support dogs in the courtroom when victims of certain crimes are testifying. Section 868.4 provides in part "If requested by either party in a criminal or juvenile hearing, and if a therapy or facility dog is available to the party within the jurisdiction of the judicial district in which the case is being adjudicated, the following individuals shall be afforded the opportunity to have a therapy or facility dog accompany him or her while testifying in court, subject to the approval of the court: [¶] . . . [¶]

---

[3] We discuss the facts pertinent to defendant's claim that the prosecutor committed misconduct in connection with our discussion of that issue.

3

A victim who is entitled to support persons pursuant to Section 868.5."[4] (§ 868.4, subd. (a)(2).)

Section 868.4 was enacted to codify the holding in *People v. Chenault* (2014) 227 Cal.App.4th 1503 (*Chenault*). (§ 868.4, subd. (g)(1).) In *Chenault*, the trial court allowed minor victims of sex crimes to have a support dog present during their testimony in addition to a support person. (*Chenault*, at pp. 1510–1511.) In that case, the defendant asserted the presence of the support dog was "inherently prejudicial and violated his federal constitutional rights to a fair trial and to confront witnesses against him." (*Id*. at p. 1514.)

The appellate court compared the presence of the support dog to the statutorily authorized presence of a support person. (*Chenault*, *supra*, 227 Cal.App.4th at p. 1515; § 868.5.) It noted " '[c]ase law uniformly rejects arguments that section 868.5 is inherently prejudicial, erodes the presumption of innocence, and impermissibly encroaches on confrontation clause and due process rights. [Citations.]' (*People v Ybarra* (2008) 166 Cal.App.4th 1069, 1077[, disapproved on other grounds in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1370–1371]. . . .) The California Supreme

---

[4] All four victims in this case were entitled to a support person based on the crimes charged against defendant as to each of them. (§ 868.5, subd. (a).) Section 868.5 allows certain witnesses to be accompanied by a support person while testifying. "[A] prosecuting witness in a case involving [enumerated crimes] . . . shall be entitled, for support, to the attendance of up to two persons of the prosecuting witness' own choosing, one of whom may be a witness, at the preliminary hearing and at the trial, or at a juvenile court proceeding, during the testimony of the prosecuting witness. Only one of those support persons may accompany the witness to the witness stand, although the other may remain in the courtroom during the witness' testimony." (*Ibid*.)

Court also stated: 'Absent improper interference by the support person, . . . no decision supports the proposition that defendant advances here, that the support person's mere presence infringes his due process and confrontation clause rights.' " (*Chenault*, at p. 1515.)

In *People v. Spence* (2012) 212 Cal.App.4th 478 (*Spence*), the defendant maintained the presence of both a therapy dog and a support person during the victim's testimony was error. (*Id*. at p. 516.) In the trial court, defendant asserted " 'a furry friend in the court will cast the witness in even a more sympathetic light.' " (*Id*. at p. 511.) "On appeal, [defendant] argue[d] these procedures or support system interfered with his due process rights to a fair trial and confrontation of witnesses, by serving to conclusively label [the witness] as a victim who required the support not only of a 'victim advocate,' but also a therapy dog, to go to the witness stand." (*Ibid*.)

The appellate court in *Spence* stated, "It is established that a support person's mere presence with a witness on the stand . . . does not infringe upon a defendant's due process and confrontation clause rights, unless the support person improperly interferes with the witness's testimony, so as to adversely influence the jury's ability to assess the testimony." (*Spence, supra,* 212 Cal.App.4th at p. 514.) The court concluded "we cannot say that the hazards identified in [*People v.*] *Patten*, [1993] 9 Cal.App.4th [1718,] 1726, from the presence of a support person (or even a support dog) were present: ' "(1) the potential of influencing the jury with a subconscious message that the victim is traumatized and therefore it is more likely the sexual assault occurred, and (2) the concern that the presence of a person supporting the witness may add credibility to the witness's testimony—i.e., the support person is vouching for the credibility of the witness." " " (*Spence*, at p. 518.)

5

The court further concluded the trial court's "implied findings of necessity were justified." (*Ibid.*)

Our high court recently considered a defendant's claim that "his confrontation rights were infringed because the presence of witness support persons interfered with the jury's observation of testifying witnesses' demeanor." (*People v. Chhoun* (2021) 11 Cal.5th 1, 38 (*Chhoun).*) In *Chhoun*, certain witnesses in a murder case testified with a support person, including one who was an employee of the prosecutor's office, and a support person sat in the audience. (*Id.* at p. 34.)

The court observed there are "four key components of the confrontation right: '(1) the face-to-face confrontation, (2) the oath, (3) the cross-examination, and (4) the jury's observation of the witness's demeanor.' " (*Chhoun, supra*, 11 Cal.5th at p. 38.) It held the use of a support person does not "deny face-to-face confrontation with an accuser, a core concern of the confrontation clause." (*Id.* at p. 37.) Neither does a "support person's mere presence in the courtroom or at the witness stand . . . infringe the defendant's due process or confrontation rights unless there is evidence of improper interference by the support person." (*Id.* at p. 38.)

Defendant maintains the trial court here failed to consider whether the support dog would " 'interfere with the witnesses' testimony in a way that adversely affects the jury's ability to assess that testimony,' " relying on *People v. Valenti* (2016) 243 Cal.App.4th 1140, superseded by statute on other grounds as stated in *People v. Clotfelter* (2021) 65 Cal.App.5th 30, 52. Although *Valenti* held a "support person's mere presence with a testifying witness does not violate the defendant's due process or confrontation clause rights," it "acknowledge[d] there may be a constitutional violation where the support person interferes with the witness's testimony in a way that

6

adversely affects the jury's ability to assess that testimony. [Citation.] For example, emotional displays or physical contact with the witness may signal to the jury that the support person believes or endorses the witness's testimony." (*Valenti,* at p. 1171.)

Defendant acknowledges "[o]bviously, we are not concerned that a juror would think [the dog] 'believed' the testimony." Instead, he maintains that, due to victim S.C.'s testimony involving her own dog, the support dog's "presence was likely to have unfairly biased juror in favor of the prosecution."

S.C. testified about an incident in which defendant raped her after finding her asleep in her car with her dog. Defendant told her she was " 'hella messed up' " and he could take her to jail. S.C. begged him not to because there would be nobody to take care of her dog. As defendant began to rape S.C., she could see her dog locked in her car. Defendant told her " '[y]ou should be grateful that I'm not taking you to jail because then you could lose your dog,' " and that "snapped [her] right back into doing whatever he said mode."

Defendant maintains that given S.C.'s testimony that she "submitted" to the rape because if defendant took her to jail "she would be separated from her beloved little dog," the presence of a support dog during her testimony "was likely to have evoked sympathy and empathy for [S.C.], and, by extension, for the other complaining witnesses, especially those [the dog] accompanied."[5] He maintains the support dog's presence "created an improper influence" which "skewed the jurors' perception of the witnesses' demeanor," violating his due process and confrontation rights.

---

[5] It is not clear from the record whether the dog accompanied all four witnesses when they testified. The record reflects the dog was at least present during the testimony of S.C. and Destiny.

Defendant neither provides any explanation nor cites any evidence supporting his claim that the presence of the support dog, itself, rather than S.C.'s testimony about defendant's actions (raping her and threatening to arrest her and take away her dog), was what evoked sympathy for S.C. "and, by extension, for the other complaining witnesses." Indeed, defendant focuses on S.C.'s "testimony about a homeless woman's desperate love for her 'sad little dog,'" implicitly acknowledging that the testimony, itself, evoked sympathy in the jury.

Nor does defendant provide any explanation of how the presence of the support dog "skewed the jurors' perception" of S.C.'s demeanor. There is no evidence the jury could see the dog. The court observed, during Destiny's testimony, the jury "may or may not be able to see, but there is a service dog." And as the trial court observed in relation to the testimony of the service dog handler, any jury "favoritism because he is a dog person" would not apply to "cat people."

Prior to the victims' testimony, the trial court instructed the jury that "Destiny and some other witnesses who testify may have the companionship of a dog. You may or may not be able to see, but there is a service dog sitting next to Destiny whose name is Clover, and the law allows for the accommodation of witnesses to have service dogs, and you are to take nothing from that fact. It is not evidence, and you cannot infer anything from it or discuss it as part of your deliberations." The court again instructed the jury at the close of trial that certain witnesses "had a dog present during their testimony. Do not consider the support dog's presence for any purpose." We presume the jury followed these instructions. (*Chhoun, supra,* 11 Cal.5th at p. 30.)

In sum, defendant cites no case holding the presence of a support dog infringes on a defendant's constitutional rights, nor has he demonstrated that under the facts of this case, the support dog's "mere presence created an improper influence."

***Claimed Prosecutorial Misconduct***

Defendant maintains the prosecutor committed misconduct in her closing statement by "indulg[ing] in the rankest 'send a message' polemic," vouching for the credibility of witnesses, and arguing facts not in evidence.

To begin with, defendant has forfeited his complaints about the prosecutor's argument by failing to object to any of the comments about which he now complains. He maintains the issue was preserved by his motion in limine seeking to "[p]rohibit the prosecution from arguing for conviction for reasons related to deterrence, social problems or for protection of the community, or protection from speculative future harm." However, "to preserve a claim of prosecutorial misconduct for appeal, ' " 'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.' " [Citation.] The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 942–943.) We nevertheless shall address the issue given defendant's claim that, if his claims are forfeited, his counsel provided ineffective assistance.

"Advocates have wide latitude to comment on the evidence and may present vigorous argument to do so. [Citation.] So long as the prosecutor's argument is a fair comment on the evidence, or constitutes a reasonable inference from it, no misconduct will be found." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 788.) " ' "[S]o long as a prosecutor's

9

assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching.' " " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1330.)

" ' "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" ' [Citation.] 'A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1009–1010.) " 'When a claim of misconduct is based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " ' [Citations.] Prosecutorial misconduct can result in reversal under state law if there was a 'reasonable likelihood of a more favorable verdict in the absence of the challenged conduct' and under federal law if the misconduct was not 'harmless beyond a reasonable doubt.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 334.)

### *Appeal to Juror's Passions*

Defendant first claims the prosecutor "indulged in the rankest 'send a message' polemic," that was an improper "appeal to the jurors' passions or their sympathy for the victims." He identifies the following portion of the prosecutor's closing:

"And each of these women one by one has come in here and told you what happened to them. The raw, unvarnished, unpracticed truth. And they don't expect you to believe them. They didn't expect anybody to believe them. They think that you are going to look at them and all you are going to see is their addiction, their criminal histories. Everything that made them the perfect prey, they think you are going to look at that and not believe them.

"But we as a community entrusted this man with a gun and a badge, and we empowered him in our name to go out and police, to arrest people, if needed, to enforce laws, to use force if necessary.

"The power does not change people. Power just lets you be who you are. It brings that out in you. You've seen who he is.

"Tell those women with your verdicts that they are not voiceless, they are not helpless, they can be believed. Tell them we will not stand by idly while a man that represents us uses the tools that we have given him, uses that badge, to prey on them, to rape them, and do whatever he wants because he is a police officer. Not on our watch and not in our names."

Defendant maintains this argument constituted misconduct because it "appeal[ed] to the jurors' emotions" and "asked the jurors to find [him] guilty, not on the evidence, but to send a message . . . that 'we' believed the witnesses and would not tolerate such conduct."

11

Argument urging the jury to "send a message" has been found improper. In *United States v. Sanchez* (9th Cir. 2011) 659 F.3d 1252, for example, the prosecutor addressed the defendant's claim of duress in closing argument as follows: "[W]hy don't we send a memo to all drug traffickers, to all persons south of the border and in Imperial County and in California— why not our nation while we're at it. Send a memo to them and say dear drug traffickers, when you hire someone to drive a load, tell them that they were forced to do it. . . . [T]hey'll get away with it if they just say their family was threatened." (*Id.* at p. 1256.) The federal court concluded this amounted to misconduct because it "urged the jury to convict 'for reasons wholly irrelevant to [defendant's] guilt or innocence.' [Citation.] The point of the 'send a memo' statement was that if the jury acquitted [defendant] based on his duress defense, the verdict would in effect send a message to other drug couriers to use that defense themselves." (*Id.* at p. 1257.)

In *United States v. Weatherspoon* (9th Cir. 2005) 410 F.3d 1142, the prosecutor argued, "Convicting Mr. Weatherspoon is gonna make you comfortable knowing there's not convicted felons on the street with loaded handguns, that there's not convicted felons carrying around semiautomatic. . . ." (*Id.* at p. 1149.) Concluding this was improper, the federal court stated, "We have consistently cautioned against prosecutorial statements designed to appeal to the passions, fears and vulnerabilities of the jury." (*Ibid.*)

Similarly, in *United States v. Barragan* (9th Cir. 2017) 871 F.3d 689, the court concluded the following argument by the prosecutor constituted misconduct: "The Mexican Mafia started years and years ago, and it's going to keep going years and years from now. . . . [¶] But for these defendants, for what they did to the community in 2010 and 2011, it's finally the chance to

12

stand up and say no more. No more robbery. No more dealing and [peddling] your meth to raise your money to buy your guns. Nor more committing extortion. No more beating the people of this community and firing guns down the street. No more. No more passing funds. Nor more meeting up and coordinating who's going to be able to tax who in what territory, so that you can then coordinate who gets the guns, who goes to the hotels and the 7-Elevens, who goes up to the AM/PM in the middle of the day to jack a drug dealer as he sits there with his one-year-old, but not a drug dealer. There's just no more, and it's the only reason that we are here today." (*Id.* at p. 706.) The court explained, " '[P]rosecutors may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence.' " (*Id.* at p. 707.)

In contrast, " '[n]othing prevents the government from appealing to the jurors' sense of justice, or from connecting the point to the victims in the case.' [Citations.] And prosecutors can appeal to jurors' duty to the community. [Citation.] 'Unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible.' " (*United States v. Hall* (6th Cir. 2020) 979 F.3d 1107, 1122.)

Thus, in *United States v. Alloway* (6th Cir. 1968) 397 F.2d 105, the federal court concluded comments similar to those challenged by defendant here did not constitute misconduct. The prosecutor in *Alloway* argued, " 'You the jurors, are called upon in this case to be the world conscience of the community. And I'm calling on this jury to speak out for the community and let the John Alloways know that this type of conduct will not be

13

tolerated. . . ." (*Id.* at p. 113.)  The court concluded "We cannot say that the quoted argument exceeded permissible bounds of advocacy. . . ." (*Ibid.*)

Likewise, in *People v. Holmes, McClain and Newborn*s, *supra*, 12 Cal.5th at page 789, defendants maintained "it was misconduct for the prosecutor to urge the jury to solve the social problems of gangs and violence by returning convictions."  No objection was interposed, but the court nevertheless observed "[h]ad [the issue] been properly preserved, the prosecutor's comments were tantamount to comparing the jury to ' "the conscience of the community," ' a practice we have routinely upheld as proper." (*Ibid.*)  The defendants also claimed it was "misconduct for the prosecutor to request convictions so that the victims could rest in peace." (*Ibid.*)  The court concluded that "[v]iewed in context of the closing argument as a whole, the statement did not constitute inflammatory rhetoric designed to provoke a thoughtless emotional response.  [Citation.]  It was fair comment on the crimes committed and the jury's role in dispensing justice." (*Ibid.*)

The prosecutor's comments in this case were more akin to the "conscience of the community" remarks that have been approved by the courts.  "Tell those women with your verdicts that they are not voiceless, they are not helpless, they can be believed.  Tell them we will not stand by idly while a man that represents us uses the tools that we have given him, uses that badge, to prey on them, to rape them, and do whatever he wants because he is a police officer.  Not on our watch and not in our names."  The comments were also fair comment on the evidence.  The prosecutor pointed out all four women were vulnerable and powerless and were targeted for that reason, because they might not be believed.  "They didn't expect anybody to believe them.  They think that you are going to look at them and all you are going to see is their addiction, their criminal histories.  Everything that made them

14

the perfect prey, they think you are going to look at that and not believe them." Thus, this was evidence-based, rather than an "appeal to the passions, fears and vulnerabilities of the jury." (*United States v. Weatherspoon, supra,* 410 F.3d at p. 1149.)

### *Vouching*

Defendant also maintains the prosecutor improperly vouched for the witnesses' credibility.

" ' "[A] prosecutor is given wide latitude to vigorously argue his or her case" ' [citation] and ' "may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' " ' [Citation.] 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.)

Defendant identifies the following six comments as improper vouching for the witnesses' credibility. 1. "And each of these women one by one has come in here and told you what happened to them. The raw, unvarnished, unpracticed truth." 2. "These women have no reason to lie." 3. "[Destiny] was asked some questions and she answered them pretty honestly." 4. "Again, I submit to you these people aren't coached. They are not rehearsing what they are going to say here in front of you." 5. "The victims in this case are credible." 6. 'The law enforcement . . . in this case have been credible."

Defendant relies on *United States v. Kerr* (9th Cir. 1992) 981 F.2d 1050 (*Kerr*). In *Kerr,* the prosecutor made the following remarks during closing argument: " 'Very frankly, ladies and gentlemen, it is very seldom you get four people, the government was lucky enough to, to have hand-to-hand deals

with the defendant like they did here. So it is going to come down to your judging the credibility of each one of those four individuals. Were they hoodwinking [DEA Agent] Mr. Zarndt when I sat there on part of the interviews, were they hoodwinking me, were they hoodwinking the Court, when the Court accepts their plea agreements when they agreed to cooperate?" [¶] [Defense counsel]: 'I object to him putting you in this, Judge. You don't belong.' [¶] THE COURT: 'All right. Sustained. I agree.' [¶] In addition to this exchange, the transcript also reveals other instances of vouching for government witnesses that went unchallenged:

[¶] 'I think he (Jim Ludden) was very candid.'

[¶] 'I don't think it was a pat story, because there are variations.'

[¶] 'I think he (Al Butler) was candid. I think he was honest.'

[¶] 'Al Butler was candid with you folks.'

[¶] 'The question is, were they hoodwinking you when they testified? I think not.' " (*Kerr, supra,* 981 F.2d at pp. 1052–1053.)

The federal court concluded these statements amounted to misconduct, explaining "Here, an experienced United States attorney deliberately introduced into the case his personal opinion of the witnesses' credibility. He repeatedly ignored his special obligation to avoid improper suggestions and insinuations. A prosecutor has no business telling the jury his individual impressions of the evidence. Because he is the sovereign's representative, the jury may be misled into thinking his conclusions have been validated by the government's investigatory apparatus." (*Kerr*, *supra*, 981 F.2d at p. 1053.) "[The prosecutor] added fuel to the fire by suggesting in his closing remarks that the district court, in accepting the plea agreements of the witnesses, had been satisfied as to the truthfulness of their proposed testimony. A prosecutor must not abuse his position and his duty to see justice done by

16

invoking the authority of the court. 'That particular form of vouching goes beyond the mere proffer of an institutional warranty of truthfulness; rather, it casts the court as an active, albeit silent, partner in the prosecutorial enterprise.' " (*Ibid.*)

However, in this case, the prosecutor neither stated her personal belief in the witnesses' testimony nor invoked the authority of the court as a "silent partner." She did not repeatedly state that she personally believed in the veracity of the witnesses. Indeed, she only referred to herself once, and the statement was "I submit to you these people aren't coached. They are not rehearsing what they are going to say here in front of you." This statement did not reflect the prosecutor's personal beliefs about the witnesses' veracity, nor did it suggest she had personal knowledge that was not in evidence. In short, the statements to which defendant now objects were appropriate comments on the witnesses' testimony and demeanor.[6]

As our high court stated in *People v. Boyette* (2002) 29 Cal.4th 381, 433, "Although a prosecutor may not personally vouch for the credibility of a witness, a prosecutor may properly argue a witness is telling the truth based on the circumstances of the case. [Citation.] Here, although the prosecutor argued [the witness] was credible, she did so in the context of his being an eyewitness to the crime and argued that aspects of his testimony suggested he was telling the truth. This was permissible argument." As in *Boyette*, the prosecutor's comments here did not suggest she "was privy to undisclosed information and thus constituted improper vouching for [the witness's]

---

[6] Indeed, the witnesses testified they were afraid to testify and were not "willingly" in court. And some of the victims' friends or family members testified the victims were reluctant to file a complaint or testify.

credibility. It was, instead, simply argument based on inferences from the evidence presented." (*Ibid.*)

### Facts Not in Evidence

Lastly, defendant maintains the prosecutor committed misconduct by "arguing facts not in evidence."

In his closing, defense counsel argued A.A. had a motive to lie because she was on probation and was required to report any contact with the police to her probation officer, Ronda Armijo. Defendant claims the italicized portions of the following rebuttal by the prosecutor referred to facts not in evidence: "[Defense] Counsel says [A.A.] was going to tell her probation officer a lie because she was worried this contact was going to be reported to her probation officer. But you heard from both the probation officer and [A.A.]. *They had a good relationship. They were hugging upstairs before . . . Ms. Armijo came down and testified. They are friendly. She is not afraid of her PO.*" (Italics added.)

However, those facts were in evidence. A.A. testified, "I like Ronda [Armijo]. She is easy to talk to, and I had her for a few years on probation. She was supportive and tried to help me along the way. When asked "When you saw her today, you gave her a big hug?" A.A. responded "Yeah."

In his reply brief, defendant concedes A.A. testified she hugged her probation officer, but still claims the prosecutor improperly "presented the event as something the prosecutor had witnessed." She did not. The prosecutor's comments did not indicate they were based on her observation, but were based on A.A.'s testimony, and thus did not refer to facts outside the record.

In sum, even had defendant preserved his claims of misconduct, none of the challenged statements rose to the level of prosecutorial misconduct.[7]

### Section 654 and Sentencing for Counts 17 and 18, 19 and 20, and 21 and 22

At the time defendant was sentenced, section 654 provided "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provisions that provides for the longest potential term of imprisonment. . . ." (§ 654, former subd. (a); *People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

Following the initial briefing, Assembly Bill No. 518, effective January 1, 2022, amended section 654. It now provides in pertinent part: " 'An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision.' . . . As amended by Assembly Bill 518, Penal Code section 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani, supra*, 74 Cal.App.5th at p. 379, italics omitted.)

The parties submitted supplemental briefing on the amendment. Defendant maintains the amendment is retroactive and gives the trial court "discretion to impose punishment on either count 17 or 18, either count 19 or 20, and either count 21 or 22." He also asserts the trial court now has discretion to choose to stay count 19 rather than count 15.

---

[7] Given our conclusion that the prosecutor did not commit misconduct, counsel's failure to object was not ineffective assistance of counsel. Nor was there cumulative error.

The Attorney General does not dispute the retroactive application of the amended statute (see *People v. Mani, supra*, 74 Cal.App.5th at p. 379), but asserts there is no need to remand because "[p]ursuant to the One Strike law, execution of the 25-years-to-life term was *mandatory* for counts 17, 19, and 21."[8]

In *People v. Caparaz* (2022) 80 Cal.App.5th 669 (*Caparaz*), the Attorney General took the same position, asserting "remand is not necessary here because the trial court is without discretion to stay punishment mandated by the One Strike law" and relying "on section 667.61, subdivision (h) (section 667.61(h)), of the One Strike law, which provides, '*Notwithstanding any other law*, probation shall not be granted to, *nor shall the execution or imposition of sentence be suspended for*, a person who is subject to punishment under this section.' " (*Caparaz*, at pp. 688–689.) The Court of Appeal "agree[d] with the Attorney General's reading of section 667.61(h) because it comports with the plain meaning of the provision and does not render the phrase 'nor shall the execution or imposition of sentence be suspended for' surplusage. This reading also serves the purpose of the One Strike law, which is 'to increase the penalties imposed on defendants who commit certain sexual offenses under specified circumstances.' " (*Id.* at p. 689, quoting *People v. Betts* (2020) 55 Cal.App.5th 294, 299.)

We agree with *Caparaz* that the trial court was required to impose 25-years-to-life terms for counts 17, 19 and 21 under the One Strike law.

---

[8] Counts 17 and 21 were for forcible oral copulation under former section 288a, subdivision (c)(2)(A), now renumbered section 287, subdivision (c)(2)(A). Count 19 was for forcible rape under section 261, subdivision (a)(2). Under section 667.61, subdivisions (a), (c)(1), (c)(7), and (d), these offenses "shall be punished by imprisonment in the state prison for 25 years to life," and the trial court sentenced him accordingly.

(§ 667.61, subds. (h), (i).)  As *Caparaz* explains, regardless of the revisions to section 654, the trial court had no discretion to stay those counts. Accordingly, remand as to those counts is unnecessary.

### *Section 654 and Sentencing for Counts 4 and 5; Stay of Count 15*

The trial court imposed concurrent sentences for count 4 (burglary to rape A.S.) and count 5 (attempted rape of A.S.).  The parties agree that, given the amendment of section 654, the matter should be remanded so the trial court can decide which count should be stayed.  We agree.  (§ 654, subd. (a).)

In the initial briefing, the parties also agreed the convictions for count 15 (kidnapping Destiny to commit rape) and count 19 (forcible rape of Destiny) punish the same act.  The Attorney General conceded the sentence for count 15 should be stayed and the abstract of judgment amended to so reflect, and reiterates that position in its supplemental brief.  As the trial court had no discretion to stay count 19, we agree that count 15 should be stayed and remand is likewise unnecessary.

## DISPOSITION

The matter is remanded for the trial court to exercise its discretion as to whether to stay execution of the sentence in count 4 or count 5.  The execution of sentence on count 15 is stayed.  The clerk of the superior court is directed to amend the abstract of judgment accordingly, and to forward a copy of that amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

21

_____

Banke, J.


We concur:


_____

Humes, P.J.


_____

Margulies, J.


A159539, People v. Winchester